Judge Ricardo S. Martinez

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10  UNITED STATES OF AMERICA,         )
                                       )    CR10-0027RSM
11              Plaintiff,             )
                                       )
12        v.                           )    GOVERNMENT'S RESPONSE
                                       )    TO SENTENCING
13  TRUNG DINH PHAN,                   )    MEMORANDUM AS TO
          a.k.a. Tony,                 )    MDMA GUIDELINES
14                                     )
                Defendant.             )
15  _____)

16        Comes now the United States of America, by and through Jenny A. Durkan,

17  United States Attorney for the Western District of Washington, and Susan M. Roe and

18  Roger S. Rogoff, Assistant United States Attorneys for said District, and files this response

19  to the defendant's unsealed memorandum on sentencing addressing the MDMA

20  guidelines.

21  **I.      Introduction**

22        The defense has filed a supplemental sentencing memorandum attacking the

23  appropriateness of the MDMA guidelines.  The pleading, nearly identical to others being

24  filed nationally by the lawyers, is based on two days of testimony and argument in a

25  pending sentencing in a case out of the Southern District of New York, *United States v.*

26  *Sean McCarthy,* 09CR-1136.  The attorneys have filed similar and unsuccessful

27  memoranda in *United States v. Tony The Lam et al,* CR 09-00511, Northern District of

28  California and in *United States v. Tran*, 8:07CR-00278, Central District of California. This

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 1
CR10-0027RSM

1  case, *U.S. v. Tran,* was resolved in an unpublished Ninth Circuit decision filed on

2  December 10, 2010, No. 09-50668.

3  **II.    Argument**

4         There was a rational basis for the guideline calculation for distribution of MDMA

5  to be converted to a marijuana under the Drug Equivalency Table   "Both before and after

6  *United States v. Booker*, [this Court] ha[s] applied the rational basis standard of review to

7  equal protection challenges to the Sentencing Guidelines based on a comparison of

8  allegedly disparate sentences." *Ellsworth*, 456 F.3d at 1149 (internal citations omitted).

9  "The Due Process Clause of the Fifth Amendment precludes the imposition of punishment

10  based on arbitrary distinctions, and in the sentencing  context, 'essentially duplicates' an

11  argument based on equal protection." *United States v. Fine*, 975 F.2d 596, 604 (9th Cir.

12  1992).

13         "The general rule is that legislation is presumed to be valid and will be sustained if

14  the classification drawn by the statute is rationally related to a legitimate [government]

15  interest." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985).

16  Moreover, "[t]he burden falls on the party seeking to disprove the rationality of the

17  relationship between the classification and the purpose." *United States v. Ruiz-*

18  *Chairez,* 493 F.3d 1089, 1090 (9th Cir. 2007).

19         The MDMA Anti-Proliferation Act of 2000, Pub. L. No. 106- 310, title XXXVI,

20  114 STAT. 1101, 1242 (2000), granted the United States Sentencing Commission the

21  power to provide for enhanced punishment for MDMA distributors.  In the MDMA Brief

22  Report of February 2001, the congressional directive provided that "[t]he Commission is

23  required to provide increased penalties to reflect the seriousness of the offenses [related to

24  distribution of MDMA] and the need to deter them."  The directive specifically noted that

25  the base offense levels for MDMA-related crimes needed to be increased because the then-

26  current penalties were considered too low and there had been a surge in the targeting and

27  use of MDMA by youth.

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 2
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

On March 21, 2001, Diana Murphy, Chair of the United States Sentencing Commission provided testimony to the Senate Caucus on International Narcotics Control. Ms. Murphy testified:

> The Commission shares Congress's concern about the increase in ecstasy trafficking and abuse, particularly by our youth, and the need for aggressive law enforcement to combat the growing problem. The Commission is studying significant increases in the penalties for ecstasy trafficking and expects to complete its work on this issue soon.

In her testimony, Ms. Murphy also noted some of the following findings: MDMA use can disrupt the body's temperature regulation, which can lead to overheating, dehydration, and even death; MDMA use can cause permanent impairment of memory functions; and, MDMA is primarily used by youths, persons in their late teens and early twenties attending rave parties.  Translating this into appropriate penalties, Ms. Murphy stated:

> The challenge for the [Sentencing] Commission is to set a penalty structure that is sufficiently stringent to achieve the objectives set forth by Congress in the Ecstasy Anti-Proliferation Act and shared by the Commission, but also allows the guidelines to draw adequate penalty distinctions between drug offenders based on their functional role.
>
> Therefore, the information provided to the Commission suggests the guideline sentences for offenders with 500 to 1,000 pills - the local distributors - should be approximately five years, and the guideline sentences for offenders with 5,000 to 10,000 pills - the upper and middle level distributors - should be approximately ten years.

This conclusion was based in part on the information that MDMA pills typically weigh .25 grams, or 250 mg.  Implementing these findings and the congressional directives, the MDMA penalties were effectively increased pursuant to an amendment that went into effect in May 2001. Compare USSG § 2D1.1 (2000), comment. (n.10) (providing that 1 gram of MDMA was equivalent to 35 grams of marijuana), with USSG § 2D1.1 (2001), comment. (n.10) (providing that 1 gram of MDMA was equivalent to 500 grams of marijuana); USSG App. C, Amendment 609 (modifying the drug equivalency

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 3
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  table for MDMA by stating the conversion factor to marijuana would be 500 grams rather

2  than 35 grams).

3      Correspondingly, the conversion factor of 1 gram of MDMA to 500 grams of

4  marijuana in Application Note 10(E) to USSG § 2D1.1, and the typical MDMA pill weight

5  of 250 mg as set forth in Application Note 11 to USSG § 2D1.1, accomplishes the goal of

6  setting proportional punishments for various levels of dealers as determined by the number

7  of MDMA pills being possessed or distributed. For example, a person convicted of

8  distributing 1,000 MDMA pills would be subject to a Guideline sentencing range

9  corresponding to an offense level equivalent to distributing 125 kilograms of marijuana

10  (1,000 MDMA pills x 0.25 grams of MDMA/MDMA pill x 500 grams marijuana/gram of

11  MDMA). This corresponds to an offense level of 26 pursuant to USSG § 2D1.1(c)(7). The

12  sentencing range for this offense level is 63-78 months, or approximately five years at the

13  low end of the range as Ms. Murphy indicated to the Senate.  Similarly, a person convicted

14  of distributing 10,000 MDMA pills would be subject to an offense level equivalent to

15  distributing 1,250 kilograms of marijuana. This corresponds to an offense level of 32

16  pursuant to USSG § 2D1.1(c)(4), where the sentencing range would be 121- 151 months,

17  or approximately ten years as Ms. Murphy indicated would be appropriate for this level of

18  dealer.

19      As a result of the underlying basis and rationale for having a conversion factor, and

20  the purpose of calculating the level of punishment proportional to the different levels of

21  dealers, there is a rationale basis for use of the drug equivalency table for purposes of

22  arriving at a particular offense level and sentencing  range. *Cf. United States v. Jordan*,

23  964 F.2d 944, 946-47 (9th Cir. 1992) (rejecting constitutional challenge to drug

24  equivalency table relating to marijuana plants and finding rational basis for conversion

25  factor).

26      The Sentencing Commission considered extensive scientific and research data

27  relating to the pharmacological effects and health hazards associated with MDMA abuse.

28  For example, it considered the National Institute on Drug Abuse ("NIDA") reports which

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 4
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  concluded that the "physical problems are similar to those experienced by amphetamine

2  and cocaine users . . . ."  Sentencing Commission Report to Congress at 7.  The NIDA

3  study determined that fatalities can often be associated with MDMA abuse.  *Id*. at 7-8.

4  Additionally, the Commission was greatly concerned with the drug's effect on serotonin

5  sites within the brain.  *Id*. at 8.  As such, the Commission considered several studies

6  including those performed on both animals and humans.  *Id*.  Likewise, the NIDA reports

7  included research from a study using positron emission tomography ("PET") brain scans of

8  14 MDMA users. *Id*. at 9.  The study showed a significantly reduced number of serotonin

9  transporters throughout the brain.  *Id*.  The NIDA report also contained findings from a

10  study on an MDMA-exposed baboon which PET scans reported findings similar to those

11  reported for human MDMA users.  *Id*.

12       The Commission further relied upon a separate scientific study from German

13  researchers who conducted testing of human cognition after MDMA use.  *Id*. at 9-10.

14  These cognition tests analyzed memory and mental functions comparing MDMA users

15  with marijuana users and non-users.  *Id*. The Commission also compared the German study

16  against other MDMA research including a study of rats and a separate seven-year study

17  conducted on squirrel monkeys.  *Id*. at 9.

18       In addition to the large number of written materials considered, a public hearing

19  was held and the Commission heard testimony about MDMA "from eight experts

20  representing two-thirds of the total number of witnesses at the hearing."  *Id*. at 4.  These

21  examples show that the Commission fulfilled its institutional role by considering scientific

22  evidence of the known scientific health risks and negative effects of MDMA on the human

23  body.

24       Further, the Commission considered a vast array of information to assist in

25  developing a perspective of the national experience and impact of MDMA throughout the

26  country.  In fact, due to the Commission's outreach efforts, it "received literally hundreds"

27  of submissions from a wide variety of interested parties including: "clinicians, physicians,

28  psychologists, academic researchers, users, defense attorneys, and other interest groups, in

1  addition to the organizations and agencies that usually comment on proposed guidelines,

2  such as the Department of Justice and the Federal Public and Community Defenders." *Id*.

3  at 17.  Indeed, "the volume of public comment received on the proposed changes to the

4  guidelines for MDMA trafficking far exceeds that for any issue this Commission has

5  addressed since taking office in November 1999." *Id*. (emphasis added).

6          In studying the national impact of MDMA, the Commission determined that

7  MDMA abuse was increasing at "an alarming rate, making its potential threat equal to that

8  of cocaine and heroin." *Id*. at 10.  MDMA was estimated to be the fastest growing abused

9  drug of any in the United States.  *Id*. In developing its opinions, the Commission relied

10  upon a University of Michigan survey which concluded that 1.3 million of the nation's

11  high school students had experimented with MDMA.  *Id*. This result was confirmed by a

12  University of Michigan Institute for Social Research survey which concluded that the

13  popularity of MDMA was quickly growing in middle school and high school age youth.

14  *Id*. at 14.  Moreover, MDMA had become widespread at "rave" parties nationally and was

15  being bought and sold openly.  *Id*. at 10, 15.  Likewise, the Commission considered the

16  National Household Survey on Drug Abuse 1998 survey finding that an estimated 3.4

17  million Americans had used MDMA.  *Id*. at 13-14.

18          The Commission considered the fact that MDMA-related hospital emergency room

19  visits "skyrocketed" more than ten-fold, from 250 in 1994 to 2,850 in 1999.  *Id*. at 11.  In

20  1999 and 2000, nine deaths related to MDMA use were recorded in Detroit, Miami,

21  Philadelphia, Minneapolis/St. Paul, and Chicago.  *Id*.

22          Additionally, the Commission considered the National Center on Addiction and

23  Substance Abuse at Columbia University national survey which found that over a quarter

24  of American teens (28%) knew a friend or classmate who had used MDMA.  *Id*. at 14.  A

25  national survey by the Partnership for a Drug Free America concluded that teenage

26  MDMA use had doubled from 1995 to 2001 and that 32% of teens reported having close

27  friends who had used the drug.  *Id*. The strong evidence gathered by the Commission

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 6
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

relating to the increasing use by young people was thus a significant factor in determining the appropriate penalties for MDMA. *Id*. at 19.

The Commission also considered evidence of the increase of illegal importation of MDMA into the United States. The study of the illegal importation of MDMA expanded the Commission's understanding of the nation's experience with the drug. The Drug Enforcement Administration (DEA) testified to the Commission that "90 percent of the world's MDMA supply is manufactured in clandestine laboratories in the Netherlands and Belgium." *Id*. at 12. As such, the majority of MDMA within the United States was being imported. Concerns about importation raised additional concerns that trafficking of MDMA would become like cocaine trafficking in the early 1980s beginning in small operations and then growing into extensive organized crime trafficking entities. *Id*. at 13. The potential for involvement by large drug trafficking organizations was further magnified by the potential for "enormous profits" that could be realized because of the drug's "huge markup" making it "irresistible to many not otherwise involved in drugs." *Id*. As such, the Commission weighed these concerns about MDMA importation and profit potential into its final conclusions on the appropriate sentencing ranges for MDMA offenders.

The potential for trafficking in MDMA caused the Commission to analyze these trafficking patterns so that they could target high-level "kingpin distributors" and ensure that they received the highest penalties while the low level and local distributors received lower sentences, respectively. *Id*. at 18. To help in understanding the various roles individuals play with a MDMA drug organization, DEA assisted the Commission in breaking down the relationship between the number of pills handled by each member of the drug organization and their functional roles within the distribution network. *Id*. These facts, among others, assisted the Commission in gaining a broad understanding of the national impact of MDMA.

After thorough consideration of both the scientific studies and the national experience, the Commission found that one gram of MDMA should be considered equal to

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 7
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  500 grams of marijuana.  The Commission explicitly stated the factors it considered in

2  reaching its conclusions included:

> 3  The significant increase in prevalence of use – particularly increases in use
> among young people; the growing availability of the drug; evidence
> 4  supporting both short- and long-term health consequences of use, including
> brain damage; reports of compulsive use of the drug by some users; the
> 5  current limited evidence suggesting collateral consequences resulting from
> distribution of the drug; and importation and trafficking patterns.  *Id*. at 19.
> 6

7  Accordingly, the Commission concluded that "a marijuana equivalency of 500

8  grams reflects the unique pharmacological and physiological harms of ecstasy, the fact that

9  the drug is aggressively marketed to and used by our youth, and its importation and

10  trafficking pattern[s]."  *Id*. at 5.  In sum, the Commission's Report to Congress

11  conclusively shows that it fulfilled its institutional role by considering both scientific

12  evidence and national experience before making its drug equivalency calculations for

13  MDMA.

14  In light of the above, the Sentencing Commission appropriately fulfilled its

15  mandate and established guidelines that are supported by a rational basis and are

16  constitutional.

17  Even if the MDMA guideline lacks an empirical basis, *Kimbrough* does not require

18  a district court to reject it.  There is no legal rule requiring a district court to exercise any

19  authority under *Kimbrough v. United States,* 552 U.S. 85 (2007).  The 9th Circuit recently

20  held that "even if the guideline lacks an empirical basis, *Kimbrough* does not require a

21  district court to reject it; *Kimbrough* merely recognizes a district court's discretion to do

22  so."  *United States v. Juarez-Mendez,* 2009 WL 4882597, (9th Cir. 2009) (unpublished).

23  "*Kimbrough* does not force district or appellate courts into a piece-by-piece analysis of the

24  empirical grounding behind each part of the sentencing guidelines."  *United States v.*

25  *Duarte,* 569 F.3d 528, 530 (5th Cir. 2009); *United States v. Huffstatler*, 571 F.3d 620,

26  623-24 (7th Cir. 2009) (holding that district courts may impose a sentence below the child

27  pornography guidelines based on a disagreement with them, but are not required to do so.)

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 8
CR10-0027RSM

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    The Seventh Circuit has explained that, "we do not think a judge is required to
2  consider . . . an argument that a guideline is unworthy of application in any case because it
3  was promulgated without adequate deliberation." *United States v. Aguilar-Huerta*, 576
4  F.3d 365, 367-68 (7th Cir. 2009) (emphasis in original); *United States v. O'Connor,* 567
5  F.3d 395, 398 (8th Cir. 2009) (recognizing that *"Kimbrough*...do[es] not hold that a district
6  court must disagree with any sentencing guideline, whether it reflects a policy judgment of
7  Congress or the Commission's 'characteristic' empirical approach.") *Aguilar- Huerta*
8  recognized that a sentencing judge "should not have to delve into the history of a guideline
9  so that he can satisfy himself that the process that produced it was adequate to produce a
10  good guideline." 576 F.3d at 368.  In fact, if the judge "is required to do that, sentencing
11  hearings will become unmanageable, as the focus shifts from the defendant's conduct to
12  the 'legislative' history of the guidelines." *Id*.

13    *Kimbrough* simply does not establish a legal rule compelling a district court to
14  scrutinize each individual guideline to determine whether it has an "empirical" basis and
15  reject any guideline that lacks one.  552 U.S. at 108-11.  Rather, *Kimbrough's* narrow
16  holding is that it is permissible - not mandatory - for a district court to impose a
17  below-guidelines sentence in a crack cocaine case, due to the unique infirmities of the
18  crack guideline (e.g., the Sentencing Commission did not rely on empirical data when
19  initially promulgating that guideline, and then repeatedly sought to revise it but was barred
20  from doing so by Congress).  *Id*.

21    Even if the Commission did not fulfill its institutional role, a district court does not
22  abuse its discretion by refusing to reject a Guideline provision under its *Kimbrough*
23  authority.  *Juarez-Mendez*, 2009 WL 4882597 (holding that "even if the guideline lacks an
24  empirical basis, *Kimbrough does* not require a district court to reject it; *Kimbrough* merely
25  recognizes a district court's discretion to do so."); see also *United States v. Lopez-Reyes,*
26  589 F.3d 667, 671 (3rd Cir. 2009) (holding that the district court "had no obligation" to
27  exercise its *Kimbrough* discretion in favor of the defendant.)

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 9
CR10-0027RSM

1    As the Eighth Circuit has stated, *"Kimbrough* did not mandate that district courts

2  consider the crack/powder sentencing disparity and do not act unreasonably, abuse their

3  discretion, or otherwise commit error if they do not." *United States v. Battiest,* 553 F.3d

4  1132, 1137 (8th Cir. 2009) (rejecting the defendant's argument that the district court

5  abused its discretion because the guidelines' recommended child pornography sentences

6  were based on unsound policy and lacked empirical support). *Battiest* further recognized

7  that "even if there were merit to Battiest's argument . . . we still would not hold the district

8  court abused its discretion by rejecting Battiest's claim." *Id. Aguilar-Huerta*, 576 F.3d at

9  368 (holding that a district judge would not violate his sentencing discretion by applying

10 an "invalid" guideline provision); *United States v. Lemus-Gonzalez,* 563 F.3d 88, 94 (5th

11 Cir. 2009) (district court did not abuse its discretion by refusing to vary downward by

12 rejecting the murder guideline where defendant had argued that it was not based on

13 empirical data and national experience).

14    The government attaches and incorporates by this reference two pleadings written

15 specifically on the testimony given in New York and submitted in Mr. Phan's

16 Supplemental Memorandum.  See, Supplemental Sentencing Memorandum

17 Of the United States of America and Sentencing Reply Memorandum submitted in United

18 States v. McCarthy.  These more fully address specifics raised by the defense.

19 **VI.   Conclusion**

20    The government asks the Court to uphold the MDMA guidelines.  The Commission

21 diligently fulfilled its mandate and established guidelines with a rational basis.  Some

22 scientists or members of the public may disagree with the research or the results, but such

23 //

24 //

25 //

26

27

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 10
CR10-0027RSM

1   disagreement does not render the guidelines unconstitutional.  The government asks the

2   Court to determine the offense level as set forth in the United States Sentencing

3   Guidelines.

4         DATED this 16th day of February, 2011.

5

6                         Respectfully submitted,

7                         JENNY A. DURKAN
                        United States Attorney

8

9                         *s/ Susan M. Roe*

10                         SUSAN M. ROE
                        Assistant United States Attorney

11                         WSBA 13000
                        United States Attorney's Office

12                         700 Stewart Street, Suite 5220
                        Seattle, Washington 98101-1271

13                         Telephone: 206.553.1077
                        Fax: 206.553.0755

14                         Email: Susan.Roe@usdoj.gov

15

16                         *s/ Roger Rogoff*

17                         ROGER ROGOFF
                        Assistant United States Attorney

18                         United States Attorney's Office
                        700 Stewart Street, Suite 5220

19                         Seattle, Washington 98101-1271
                        Telephone: 206.553.4330

20                         Fax: 206.553.0755
                        Email: Roger.Rogoff@usdoj.gov

21

22

23

24

25

26

27

28

1

CERTIFICATE OF SERVICE

2

    I hereby certify that on February 16, 2011, I electronically filed the foregoing with

3

the Clerk of the Court using the CM/ECF system which will send notification of such

4

filing to the attorney(s) of record for the defendant(s).  I hereby certify that I have served

5

the attorney(s) of record for the defendant(s) that are non CM/ECF participants via telefax.

6

7

            *s/Rachel Lynch*_____
            RACHEL LYNCH

8

            Legal Assistant
            United States Attorney's Office

9

            700 Stewart Street, Suite 5220
            Seattle, Washington 98101-1271

10

            Phone: (206) 553-4214
            FAX:   (206) 553-0755

11

            E-mail: rachel.lynch@usdoj.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S RESPONSE SENTENCING
MEMORANDUM ON MDMA GUIDELINES/PHAN- 12
CR10-0027RSM